UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHARINE VERNELL WASHINGTON,

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*

_____/

CASE NO. 15-14077

DISTRICT JUDGE ARTHUR J. TARNOW

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 19, 23)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Washington is not disabled. Accordingly, **IT IS RECOMMENDED** that Washington's Motion and Amended Motion for Summary Judgment, (Doc. 19),[1] be **DENIED**, the Commissioner's Motion, (Doc. 23), be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner")

---

[1] Washington filed both a Motion for Summary Judgment, (Doc. 17), and an Amended Motion for Summary Judgment, (Doc. 19). I construe the latter motion as abrogating the former motion. As such, in addressing the amended motion and recommending its dismissal, I recommend also that the initial motion be dismissed.

1

denying Plaintiff Katharine Vernell Washington ("Washington") claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 19, 23).

On November 13, 2012, Washington filed an application for DIB, alleging a disability onset date of May 1, 2010. (Tr. 137-43). The Commissioner denied her claim. (Tr. 53-61). Washington then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on June 20, 2014 before ALJ Kathleen Eiler. (Tr. 25-43). At the hearing, Washington—represented by her attorney, Ms. Ross—testified, alongside Vocational Expert ("VE") Cheryl Ross. (*Id.*). The ALJ's written decision, issued July 25, 2014, found Washington not disabled. (Tr. 10-20). On September 16, 2015, the Appeals Council denied review, (Tr. 1-4), and Washington filed for judicial review of that final decision on November 20, 2015. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

3

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Washington not disabled under the Act. (Tr. 10-20). At Step One, the ALJ found that Washington had not engaged in substantial gainful activity since her alleged onset date of May 1, 2010. (Tr. 12). At Step Two, the ALJ concluded that the following impairments qualified as severe: "affective disorder, anxiety disorder, and personality disorder . . . ." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 12-14). Thereafter, the ALJ found that Washington had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following additional nonexertional limitations:

> [S]he can perform simple, routine, and repetitive tasks with minimal changes in a routine work setting and no production rate pace work. She can occasionally interact with supervisors, but is limited to minimal, superficial interaction with co-workers and the public.

(Tr. 14). At Step Four, the ALJ found that Washington could perform "her past relevant work as a machine loader." (Tr. 19). Proceeding to Step Five, the ALJ alternatively determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 171-72).

### E.      Administrative Record

### 1.      Medical Evidence

The Court has reviewed Washington's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2.      Application Reports and Administrative Hearing

### i.      Function Report

On December 29, 2012, Washington filled out a Function Report. (Tr. 188-95). She indicated that she rents a room and lives with family. (Tr. 188). Describing her condition, she wrote that "I have problem[s] concentrating and thinking and get very aggressive very easy," has "panic attack[s]" and "suicidal ideas" sometimes, and "locks myself up in the bathroom." (*Id.*). In a typical day, Washington said that she gets up, drinks coffee and watches television, goes shopping if one of her sisters passes by, and then goes to bed. (Tr. 189). Before her condition ensued, she "used to work and be around people," which she said she cannot do now. (*Id.*). She could not sleep without her medicine. (*Id.*). In detailing issues with personal care, she indicated that while capable of dressing, bathing, caring for her hair, and using the toilet, she often cannot muster the motivation to do so. (*Id.*). Her roommate would help her remember to take her

6

medication and to groom. (Tr. 190). She did not cook as much as she used to because "thinking and concentrating take too much time." (*Id.*). Even so, she would spend about "forty minutes three days a week" doing other chores, such as "wash[ing] dishes and sweep[ing] [the] floor." (*Id.*).

Twice a week, Washington would use transportation to travel around. (Tr. 191). She would not leave alone, however, because sometimes "I have panic attacks," and she did not drive "because I don't pay attention and thinking is hard sometimes." (*Id.*). When she went shopping, it would take two hours for her to buy clothes, shoes, groceries, and the like. (*Id.*). Because she had no income, she did not pay bills, count change, handle a savings account, or use a checkbook. (*Id.*).

Washington "love[s] to read books" in her free time, for about two hours a day. (Tr. 192). However, since the onset of her condition, her desire to read would "come[] and go." (*Id.*). Though she did not spend time with others—because "I don't get along with my family and ex-friends they always talk trash to me," (Tr. 193)—she would regularly go to church and to the clinic for several hours. (*Id.*). She did not get along with authority figures because "they aggravate me." (Tr. 194). She had never, however, been fired from a job due to social problems. (*Id.*).

As to her abilities, Washington checked difficulty with talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 193). She noted that she could only walk two blocks before needing to rest for twenty minutes. (*Id.*). In addition, she wrote that her capacity to follow written

and spoken instructions varied from being "ok" to requiring extra time or repetition in order to understand. (*Id.*).

A third party Function Report, submitted by Washington's friend Anthony Slater, provides more details as to her life and condition. (Tr. 172-79). He noted that sometimes "I have to remind her to take [a] shower and change clo[th]e[s]." (Tr. 173). He touched on Washington's lack of income, indicating that "she used to save money when she used to work" but "now she do[es]n't." (Tr. 176). In other respects, as well, the reports remain entirely consistent.

### ii.    Washington's Testimony at the Administrative Hearing

At the hearing before ALJ Kathleen Eiler, Washington indicated that the last time she worked was February through October of 2013. (Tr. 29). She indicated that the job presented no difficulties because "all I had to do was put the stuff onto the shelf." (*Id.*). The "main thing" keeping her from working was "the medication they have me on because I hear voices on everything." (Tr. 30). Side effects from this medication included "grogg[iness] and sleep[iness]," as she would usually nap for "[a]bout five hours. . . . everyday." (*Id.*). In general, her medication would help control symptoms of "[b]ipolar and anxiety," but "I have my good days and my bad days," and "[s]ome days, it might not do anything or I might not be able to sleep." (Tr. 31). She would not hear voices if she took the medication. (*Id.*). Typically, she would visit her doctor monthly, but at the hearing they were "trying something new. We're trying to see if I can go three months straight without" a meeting. (*Id.*).

At the time of the hearing, Washington lived alone, and though "[s]ometimes I have problems with the cooking, . . . everything else" as far as household chores "I pretty much do it." (Tr. 32). Her personal needs presented more difficulty, and she had "a girlfriend that comes over and helps me out a lot" with "prepar[ing] my meals" and "mak[ing] sure I don't sleep in the shower . . . ." (*Id.*). Although she did not always have trouble getting along with others, "[i]t depends because a person come to me and be very rude or it has happened and then I snapped and be real nasty and mean to them too." (*Id.*). Other than the friend that comes over, Washington did not have other friends she kept in touch with. (*Id.*). While working at Walmart, she had "a couple of incidents" getting along with others. (Tr. 33). Although her supervisors never wrote her up, "they'd . . . mess with my hours." (*Id.*). Upon further questioning, Washington discussed how she took college classes on Wednesdays at Wayne County Community College. (Tr. 35).

Washington also indicated that she "used to read books," but said "I can't concentrate totally . . . ." (Tr. 33). On a typical "bad day," "I won't get out the bed, I won't do nothing, I won't take a shower, and I sit there and cry all day." (Tr. 34). This happened about seven times a month. Medication helped with panic attacks, but did not prevent these bad days. (*Id.*). Washington then noted the medication she took at the time: Saphris "everyday," "Klonopins twice a day," Seroquel, "amitriptyline," and "Tagamet for my stomach . . . ." (Tr. 36). She also took "Vistaril" for "the panic attacks . . . I take it one every three to six hours." (Tr. 37).

After her boyfriend assaulted her, Washington moved into a women's shelter that helped her get an apartment. (Tr. 37-38). Her rent was $18, calculated using her lack of

income and receipt of food stamps. (Tr. 38). She had a "girlfriend that helps me out a lot as far as my bills go," as well as a driver's license—but she did not drive. (*Id.*). She also had a thirty-one year old daughter, but does not see her or the rest of her family because "[w]hen I decided to leave [my boyfriend], I decided to leave my family out of the situation too. . . ." (Tr. 39).

### iii.    The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of VE Cheryl Ross to determine Washington's ability to perform work. (Tr. 40). The VE first described Washington's prior work: her "machine loader" work "would have been unskilled and medium," but "light as she described it"; her "production leader" work would have been "skilled and medium both as she performed it and per the Dictionary of Occupational Titles." (*Id.*). The "stocker position" at Walmart "would be unskilled and medium."

In her first hypothetical, the ALJ asked the VE to assume a hypothetical person with "no exertional limitations" able to "perform simple, routine, repetitive tasks with minimal changes in a routine work setting and no production rate pace work," who can "occasionally interact with supervisors, but is limited to minimal superficial interaction with coworkers and the general public." (Tr. 41). The VE indicated that such a person could perform Washington's prior work as a "machine loader," as well as other "unskilled, medium positions," such as a "machine feeder"—with 15,500 regional job availabilities and 270,000 national job availabilities—a "cleaner"—with 25,600 regional job availabilities and 280,000 national job availabilities—and a "packager"—with 7,200 regional job availabilities and 148,000 national job availabilities. (*Id.*).

10

In her second hypothetical, the ALJ added to the facts of the first hypothetical that "this person would be expected to be off task at least 15% of each work day, . . ." (Tr. 42). The VE indicated that such a restriction "would not be compatible with competitive work." (*Id.*). This concluded the ALJ's examination of the VE.

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the

Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an

impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

14

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

In her opinion, the ALJ found that Washington "ha[d] experienced no episodes of decompensation, . . . of extended duration." (Tr. 14). In her motion, Washington suggests that "the ALJ's failure to consider . . . [her] documented episodes of substantial deterioration of her mental condition"—in other words, episodes of decompensation—

15

"and their effect [on] her functioning in formulating her [RFC], establishes that the decision was not supported by substantial evidence." (Doc. 19 at ID 465). Further, Washington contends that because the ALJ "did not accurately or fairly describe the limitations caused by [her] impairments" insofar as the ALJ did not consider Washington's episodes of decompensation, "the VE's answer to such a hypothetical question[] could not constitute substantial evidence to support the ALJ's decision, as to either [Washington's] past work or any other jobs." (Doc. 19 at ID 465-66). In particular, Washington identifies four periods the ALJ should have recognized as episodes of decompensation: (1) an approximately five-month period from September 9, 2011 to February 1, 2012; (2) a one-day period of October 31, 2012; (3) an approximately four-week period between December 2014 and January 2014; and (4) an approximately two-month period from April 15, 2014 until June 20, 2014, the date of the hearing.[2] Of note, she "does not argue that her impairments met any of the Listings, . . ." (Doc. 19 at ID 465).

Episodes of decompensation remain "paragraph B" criteria, meaning that the limitations they signal "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of

---

[2] For ease of reference, I will regard these periods as "episode one," "episode two," "episode three," and "episode four."

the Listing of Impairments, and summarized on the [Psychiatric Review Technique Form]." SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996).

In turn, the term "episodes of decompensation" is defined in the Code of Federal Regulations as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(C)(4). A claimant may demonstrate such an episode via "an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation." *Id.* Alternatively, such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.*

The Commissioner posits that Washington's argument conflates episodes of decompensation with an RFC assessment, and that such argument cannot prevail because the ALJ need not factor episodes of decompensation lasting less than a year into the RFC. *See Ortiz-Rosado v. Comm'r of Soc. Sec.*, 12 F. App'x 349, 352 (6th Cir. 2001) ("The ALJ was not required to include this limitation in his hypothetical question because the record indicates that it did not meet the twelve-month duration requirement.). While the Commissioner's point rings true—none of Washington's alleged episodes meet the twelve-month requirement—I do not believe this is the gist of Washington's true

17

argument. Though her position is unconventional, Washington does not seem to contend that the ALJ *literally* should have factored her episodes of decompensation—as discrete limitations unto themselves—into the RFC. Rather, she essentially claims that the ALJ should have recognized that her conditions' severity was such that they caused numerous episodes of decompensation, and further, that due to the ALJ's inability to detect this, the RFC determination does not adequately reflect Washington's nonexertional limitations.

Nevertheless, substantial evidence buttresses the ALJ's finding that Washington suffered no episodes of decompensation lasting for an extended duration, and that the conditions underlying such alleged episodes demonstrated no disability. (Tr. 14). Sparse evidence indicates that Washington even sought or underwent treatment during episodes one and four. Such "gaps in a history of medical treatment are likely to suggest that the claimant was not receiving treatment during the gaps and was not disabled then." *Hamlin v. Comm'r of Soc. Sec.*, 104 F.3d 361, at *2 (6th Cir. 1996) (unpublished table decision). With respect to episode four in particular—her April 15, 2014, and December 12, 2014, appointments hint at a spike in certain symptoms, (Tr. 383) ("She felt that her depression and stress was lifting when she moved into her new apartment on April 1 and is no longer living in the shelter but for the last few nights the auditory hallucinations have increased."), but do not illustrate the crippling side effects alleged or necessary for an episode of decompensation. (Tr. 379, 383) ("Dressed and groomed appropriately. Alert and oriented to person, place and time. Speech is clear, . . . Appropriate affect. She does not appear to be responding to internal stimuli . . . ."). Worth noting, monthly

18

appointments hardly convey the urgent and compelling need for medical oversight expected of episodes of decompensation.

As for episode one—although Dr. Lachover assessed a GAF score of 40 to Washington on September 11, 2009, his mental assessment remains normal in nearly every respect aside from Washington's specific complaints of crying spells, depression, poor sleep, poor appetite, and excessive worry. (Tr. 218-19) (finding normal speech, pleasant and cooperative mood, no hallucinations, no racing thoughts, no suicidal or homicidal thoughts, normal reaction time, but an affect constricted to "the depressed range" and "decreased animation"). He also found her capable of maintaining later appointments for treatment, as well as possibly obtaining employment. (Tr. 221-22). Although she was carrying a knife and reportedly "very paranoid" and perhaps "need[ing] in patient treatment for her safety and safety to others" in December 2011, (Tr. 226), the appointment was not urgent, and there is no indication that she ever sought (or underwent) hospitalization at this point. (Tr. 224-26). Indeed, the record appears to show that she was *not* hospitalized. (Tr. 286) (December 2013: "She has never been admitted before to a mental health unit."); (Tr. 311) ("[Washington] denies any inpatient hospitalizations under the care of psychiatry other than her most recent hospitalization at McLaren Bay Region [in December 2013]"). Her February 2012 appointment certainly shows improvement since December 2011, but this does not come close to implying that the preceding period should be classified as involving decompensation, and the record shows that an alteration in her medicine reaped benefits. (Tr. 229). The ALJ's opinion shows that she considered all of this evidence at length. (Tr. 15-17).

Episode three lasted for only four days, and thereafter her condition remained stabilized, as she was doing well leading up to her January 2014 appointment. (Tr. 284) (listing the admission date as December 16, and the discharge date as December 20; finding that "[a]t the time of discharge, patient is calm and cooperative, denying auditory or visual hallucinations, is not responding to any internal stimuli."). The ALJ need not treat such hospitalization as decompensation for an extended duration, nor as signaling limitations that would imperil her ability to work. *Accord Donovan v. Comm'r of Soc. Sec.*, 2013 WL 6094741, at *11 (E.D. Mich. Nov. 20, 2013) ("Given that the hospitalization period was for only four days, the record strongly suggests that the April 2011 episode of decompensation . . . was not one of 'extended duration.'"). In addition, the reports suggests that the episode resulted from noncompliance with medication—(Tr. 284) ("She also reported that she was not taking her psychotropic medications for past about 1 month."); (Tr. 311) (January 2014: "She had not been taking her psychotropic medications as she ran out almost a month prior.")—an issue that resurfaces at several other points in Washington's medical history, notwithstanding her protestations at the hearing. *E.g.*, (Tr. 220) (including "[i]ncrease compliance with tx recommendations" as a strategy for Washington's treatment going forward). Likewise, episode two seems less an episode and more a naked GAF score, which record evidence—cited in the ALJ's opinion—undermines as inaccurate. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is [low] . . . ."). Significantly, the

20

ALJ's analysis shows that she considered the evidence upon which Washington relies for these two episodes in evaluating the severity of her impairments. (Tr. 16-17).

In one last respect, Washington criticizes the ALJ for "denigrat[ing]" her credibility after September 2011 on the grounds that she did not seek treatment since May 2010. (Doc. 19 at ID 470). The ALJ, however, did no such thing; rather, she merely made the permissible inference that a failure to seek treatment can help show that one's symptoms are not as severe as claimed. *See, e.g.*, *Stokes v. Comm'r of Soc. Sec.*, 2015 WL 803087, at *4 (W.D. Mich. Feb. 25, 2015) ("While the claimant has experienced increased post-traumatic stress disorder symptoms since seeing combat and leaving the Army, the evidence shows his treatment has been sporadic, while also showing some signs of noncompliance and quite a few missed appointments . . . , all of which undercuts the credibility of any subjective reports of disabling symptoms."). The ALJ points to numerous other pieces of evidence in making her credibility finding as well. (Tr. 18) (drawing on evidence of Washington's daily activities, hobbies, and capacity to work nearly full time at Walmart while taking college classes, in reflecting on Washington's credibility). For this reason, Washington's (somewhat inchoate) concern about the ALJ's credibility assessment does not undermine the ALJ's findings.

Taking this into consideration—and in recognition of the consideration given to the evidence Washington highlights—the ALJ's decompensation-related findings betray neither miscalculation nor short shrift in the context of the RFC assessment, which adequately accommodates her documented mental limitations.

21

### H.        Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Washington's Motion and Amended Motion for Summary Judgment, (Doc. 19), be **DENIED**, that the Commissioner's Motion, (Doc. 23), be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.

R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 21, 2016                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 21, 2016                    By s/Kristen Castaneda
                                           Case Manager