UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHARINE VERNELL WASHINGTON,

      Plaintiff,

v.

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

                                     /

Case No. 15-14077

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
PATRICIA T. MORRIS

**ORDER ADOPTING REPORT AND RECOMMENDATION [24]; OVERRULING PLAINTIFF'S OBJECTION [25]; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23]; AND DENYING PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT[1] [19]**

Plaintiff Katherine Vernell Washington seeks judicial review of the decision of an Administrative Law Judge ("ALJ") denying her application for disability benefits. Plaintiff filed an Amended Motion for Summary Judgment [Dkt. 19] on April 11, 2016. Defendant filed a Motion for Summary Judgment [23] on June 30, 2016. On December 21, 2016, the Magistrate Judge issued a Report and Recommendation [24] recommending that the Court grant Defendant's motion and deny Plaintiff's. Plaintiff filed an Objection to the Report and Recommendation

---

[1] Plaintiff filed a Motion for Summary Judgment [Dkt. 17] and an Amended Motion for Summary Judgment [19]. The Magistrate Judge construed the latter motion as abrogating the former motion, and in doing so, recommended that both of Plaintiff's motions be dismissed. The Court will do the same in this Order.

[25] on January 4, 2017. Defendant filed a Response to Plaintiff's Objections [26] on January 18, 2017.

For the reasons stated below, the Court **ADOPTS** the Report and Recommendation [24]. Plaintiff's Objection to the Report and Recommendation [25] is **OVERRULED**. Defendant's Motion for Summary Judgment [23] is **GRANTED**. Plaintiff's Amended Motion for Summary Judgment [19] is **DENIED**.

## FACTUAL BACKGROUND

The R&R summarized the record as follows:

### A. Introduction and Procedural History

On November 13, 2012, Washington filed an application for DIB, alleging a disability onset date of May 1, 2010. (Tr. 137-43). The Commissioner denied her claim. (Tr. 53-61). Washington then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on June 20, 2014 before ALJ Kathleen Eiler. (Tr. 25-43). At the hearing, Washington—represented by her attorney, Ms. Ross—testified, alongside Vocational Expert ("VE") Cheryl Ross. (*Id.*). The ALJ's written decision, issued July 25, 2014, found Washington not disabled. (Tr. 10-20). On September 16, 2015, the Appeals Council denied review, (Tr. 1-4), and Washington filed for judicial review of that final decision on November 20, 2015. (Dkt. 1).

### B. ALJ Findings

Following the five-step sequential analysis, the ALJ found Washington not disabled under the Act. (Tr. 10-20). At Step One, the ALJ found that Washington had not engaged in substantial gainful activity since her alleged onset date of May 1, 2010. (Tr. 12). At Step Two, the ALJ concluded that the following impairments qualified as severe: "affective disorder, anxiety disorder, and personality disorder . . . ." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 12-14). Thereafter, the ALJ found that Washington had the residual functional

capacity ("RFC")[2] to perform a full range of work at all exertional levels with the following additional nonexertional limitations:

> [S]he can perform simple, routine, and repetitive tasks with minimal changes in a routine work setting and no production rate pace work. She can occasionally interact with supervisors, but is limited to minimal, superficial interaction with co-workers and the public.

(Tr. 14). At Step Four, the ALJ found that Washington could perform "her past relevant work as a machine loader." (Tr. 19). Proceeding to Step Five, the ALJ alternatively determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 19).

### C. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Washington's medical record. In lieu of summarizing [the] medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Function Report

On December 29, 2012, Washington filled out a Function Report. (Tr. 188-95). She indicated that she rents a room and lives with family. (Tr. 188). Describing her condition, she wrote that "I have problem[s] concentrating and thinking and get very aggressive very easy," has "panic attack[s]" and "suicidal ideas" sometimes, and "locks myself up in the bathroom." (*Id.*). In a typical day, Washington said that she gets up, drinks coffee and watches television, goes shopping if one of her sisters passes by, and then goes to bed. (Tr. 189). Before her condition ensued, she "used to work and be around people," which she said she cannot do now. (*Id.*). She could not sleep without her medicine. (*Id.*). In detailing issues with personal care, she indicated that while capable of dressing, bathing, caring for her hair, and using the toilet, she often cannot muster the motivation to do so. (*Id.*). Her roommate would help her remember to take her medication and to groom. (Tr. 190). She did not cook as much as she used to because "thinking and concentrating take too much time."

---

[2] "An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." ALJ Op. at 11; *see also* 20 C.F.R. § 404.1545(a)(2) (The RFC "is the most [the plaintiff] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record.").

(*Id.*). Even so, she would spend about "forty minutes three days a week" doing other chores, such as "wash[ing] dishes and sweep[ing] [the] floor." (*Id.*).

Twice a week, Washington would use transportation to travel around. (Tr. 191). She would not leave alone, however, because sometimes "I have panic attacks," and she did not drive "because I don't pay attention and thinking is hard sometimes." (*Id.*). When she went shopping, it would take two hours for her to buy clothes, shoes, groceries, and the like. (*Id.*). Because she had no income, she did not pay bills, count change, handle a savings account, or use a checkbook. (*Id.*).

Washington "love[s] to read books" in her free time, for about two hours a day. (Tr. 192). However, since the onset of her condition, her desire to read would "come[] and go." (*Id.*). Though she did not spend time with others—because "I don't get along with my family and ex-friends they always talk trash to me," (Tr. 193)—she would regularly go to church and to the clinic for several hours. (*Id.*). She did not get along with authority figures because "they aggravate me." (Tr. 194). She had never, however, been fired from a job due to social problems. (*Id.*).

As to her abilities, Washington checked difficulty with talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 193). She noted that she could only walk two blocks before needing to rest for twenty minutes. (*Id.*). In addition, she wrote that her capacity to follow written and spoken instructions varied from being "ok" to requiring extra time or repetition in order to understand. (*Id.*). A third party Function Report, submitted by Washington's friend Anthony Slater, provides more details as to her life and condition. (Tr. 172-79). He noted that sometimes "I have to remind her to take [a] shower and change clo[th]e[s]." (Tr. 173). He touched on Washington's lack of income, indicating that "she used to save money when she used to work" but "now she do[es]n't." (Tr. 176). In other respects, as well, the reports remain entirely consistent.

### ii. Washington's Testimony at the Administrative Hearing

At the hearing before ALJ Kathleen Eiler, Washington indicated that the last time she worked was February through October of 2013. (Tr. 29). She indicated that the job presented no difficulties because "all I had to do was put the stuff onto the shelf." (*Id.*). The "main thing" keeping her from working was "the medication they have me on because I hear voices on everything." (Tr. 30). Side effects from this medication included "grogg[iness] and sleep[iness]," as she would usually nap for "[a]bout five hours. . . . everyday." (*Id.*). In general, her medication

Page **4** of **17**

would help control symptoms of "[b]ipolar and anxiety," but "I have my good days and my bad days," and "[s]ome days, it might not do anything or I might not be able to sleep." (Tr. 31). She would not hear voices if she took the medication. (*Id.*). Typically, she would visit her doctor monthly, but at the hearing they were "trying something new. We're trying to see if I can go three months straight without" a meeting. (*Id.*).

At the time of the hearing, Washington lived alone, and though "[s]ometimes I have problems with the cooking, . . . everything else" as far as household chores "I pretty much do it." (Tr. 32). Her personal needs presented more difficulty, and she had "a girlfriend that comes over and helps me out a lot" with "prepar[ing] my meals" and "mak[ing] sure I don't sleep in the shower . . . ." (*Id.*). Although she did not always have trouble getting along with others, "[i]t depends because a person come to me and be very rude or it has happened and then I snapped and be real nasty and mean to them too." (*Id.*). Other than the friend that comes over, Washington did not have other friends she kept in touch with. (*Id.*). While working at Walmart, she had "a couple of incidents" getting along with others. (Tr. 33). Although her supervisors never wrote her up, "they'd . . . mess with my hours." (*Id.*). Upon further questioning, Washington discussed how she took college classes on Wednesdays at Wayne County Community College. (Tr. 35).

Washington also indicated that she "used to read books," but said "I can't concentrate totally . . . ." (Tr. 33). On a typical "bad day," "I won't get out the bed, I won't do nothing, I won't take a shower, and I sit there and cry all day." (Tr. 34). This happened about seven times a month. Medication helped with panic attacks, but did not prevent these bad days. (*Id.*). Washington then noted the medication she took at the time: Saphris "everyday," "Klonopins twice a day," Seroquel, "amitriptyline," and "Tagamet for my stomach . . . ." (Tr. 36). She also took "Vistaril" for "the panic attacks . . . I take it one every three to six hours." (Tr. 37).

After her boyfriend assaulted her, Washington moved into a women's shelter that helped her get an apartment. (Tr. 37-38). Her rent was $18, calculated using her lack of income and receipt of food stamps. (Tr. 38). She had a "girlfriend that helps me out a lot as far as my bills go," as well as a driver's license—but she did not drive. (*Id.*). She also had a thirty-one year old daughter, but does not see her or the rest of her family because "[w]hen I decided to leave [my boyfriend], I decided to leave my family out of the situation too. . . ." (Tr. 39).

### iii. The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of VE Cheryl Ross to determine Washington's ability to perform work. (Tr. 40). The VE first described Washington's prior work: her "machine loader" work "would have been unskilled and medium," but "light as she described it"; her "production leader" work would have been "skilled and medium both as she performed it and per the Dictionary of Occupational Titles." (*Id.*). The "stocker position" at Walmart "would be unskilled and medium."

In her first hypothetical, the ALJ asked the VE to assume a hypothetical person with "no exertional limitations" able to "perform simple, routine, repetitive tasks with minimal changes in a routine work setting and no production rate pace work," who can "occasionally interact with supervisors, but is limited to minimal superficial interaction with coworkers and the general public." (Tr. 41). The VE indicated that such a person could perform Washington's prior work as a "machine loader," as well as other "unskilled, medium positions," such as a "machine feeder"—with 15,500 regional job availabilities and 270,000 national job availabilities—a "cleaner"—with 25,600 regional job availabilities and 280,000 national job availabilities—and a "packager"—with 7,200 regional job availabilities and 148,000 national job availabilities. (*Id.*).

In her second hypothetical, the ALJ added to the facts of the first hypothetical that "this person would be expected to be off task at least 15% of each work day, . . ." (Tr. 42). The VE indicated that such a restriction "would not be compatible with competitive work." (*Id.*). This concluded the ALJ's examination of the VE.

### STANDARD OF REVIEW

The Court reviews objections to a Magistrate Judge's Report and Recommendation on a dispositive motion *de novo*. *See* 28 U.S.C. §636(b)(1)(c).

Judicial review of a decision by a Social Security ALJ is limited to determining whether the factual findings are supported by substantial evidence and whether the ALJ employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ's factual findings "are conclusive if supported by

substantial evidence." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 243 (6th Cir. 1987). "Substantial evidence is defined as more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). The substantial evidence standard "does not permit a selective reading of the record," as the reviewing court's assessment of the evidence supporting the ALJ's findings "must take into account whatever in the record fairly detracts from its weight." *McLean v. Comm'r of Soc. Sec.*, 360 F. Supp. 2d 864, 869 (E.D. Mich. 2005) (quoting *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)). However, so long as the ALJ's conclusion is supported by substantial evidence, a court must "defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

## ANALYSIS

Plaintiff contends that the ALJ failed to consider her documented episodes of decompensation in the RFC determination, and therefore, the ALJ's decision was not supported by substantial evidence. Plaintiff does not dispute the ALJ's Step 3 determination that she did not suffer *repeated* episodes of decompensation, *each of extended duration.* Rather, Plaintiff argues that she experienced *some*

episodes of decompensation, and the ALJ ignored evidence of such episodes. *See* Pl.'s Obj. at 2-3 ("[T]he ALJ's failure to consider that Plaintiff's documented episodes of . . . deterioration or decompensation, and their effect [on] her functioning in formulating her . . . RFC, establishes that the decision was not supported by substantial evidence.").

The Code of Federal Regulations defines episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(C)(4). "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* Alternatively, "[e]pisodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a high structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.*

A mental impairment may qualify as a listed impairment at Step 3 if it causes at least two of the following "marked limitations": difficulty performing the

activities of daily living; difficulty maintaining social functioning; difficulty in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The regulations define "repeated episodes of decompensation, each of extended duration" as three episodes within one year, or an average of once every four months, each episode lasting for at least two weeks. 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(C)(4). However, "[i]f you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.*

The Court finds it useful to highlight a case in which the Sixth Circuit illustrated various examples of episodes of decompensation and the type of evidence that supports a finding of functional limitation. In *Lankford v. Sullivan*, Plaintiff Jimmy Lankford suffered from alcoholism, severe chronic anxiety, and depression. 942 F.2d 301, 307-08 (6th Cir. 1991). In reversing the decision to deny benefits, the Sixth Circuit cited Plaintiff's "numerous incidents of . . . decompensation," including the fact that for seven years, "Lankford left numerous jobs because of his drinking." *Id.* Lankford also abandoned his military service with a 10% disability due to anxiety, and he either left, or was fired from, various jobs due to high blood pressure, dizziness, and hyperventilation due to his nerves.

*Id.* at 308. The evidence further indicated that "[Lankford] deteriorates even in mildly stressful situations." *Id.* For instance, during a period of hospitalization at a VA hospital in Tennessee, Lankford "flew into a rage, left the hospital and went out into the rain threatening to kill himself," after learning that a social worker could not get in touch with his wife. *Id.* Once, when Lankford "was depressed and real anxious over [his Social Security] hearing [scheduled for the next day, he] . . . shot the phone off the wall and pointed the gun at his eye threatening suicide." *Id.* (internal quotations omitted). The record clearly reflected "substantial evidence of persistent problems involving physical violence against [Lankford's] wife and family members . . . [and] demonstrated hostility to neighbors, with one incident resulting in his being arrested for assault, and another involving a threat to persons with a rifle." *Id.* For these reasons, the court concluded, "the Secretary erred in failing to find Lankford disabled under step three . . . because his combined impairments were equivalent to a listed impairment." *Id.* at 309.

Contrary to the situation in *Lankford*, there is substantial evidence here to support the Commissioner's decision that Plaintiff is not disabled. To show that the ALJ considered all of the necessary evidence, the Court will review each of Plaintiff's alleged episodes of decompensation.

**A. Episode One: September 9, 2011- February 1, 2012.**

Plaintiff first argues that September 9, 2011 marks the beginning of "an episode of severe worsening of her condition." (Pl.'s Am. Mot. at 11). The doctor at the North Central Health Center determined that Plaintiff "exhibit[ed] a serious chronic condition that will require continuous treatment." *Id.* The ALJ discussed this visit, noting that the doctor observed Plaintiff to be "anxious and depressed," but also "fully oriented," "well groomed," "cooperative," behaving appropriately, thinking logically and speaking normally. (ALJ Op. at 15). The treatment notes from that date mention nothing about deterioration or decompensation. *See* Ex. 2F. Rather, September 9, 2011 was merely the first time Plaintiff sought treatment for her depression and anxiety, and the doctor's note was an initial diagnosis of Plaintiff's condition. *Id.* at 1 ("Pt. stated that she has been depressed for awhile and did not get treatment.").

Plaintiff went to a follow-up appointment on December 11, 2011. The treatment notes from that date state:

> Patient is very paranoid…She says "I think people are after me"…She is carrying a knife and she took it out of her coat pocket to show me…I feel that she needs in patient treatment for her safety and safety to others and we will transfer her to the crisis clinic for hospitalization.[3]

(Ex. 2F/9).

---

[3] Plaintiff did not go through with inpatient care.

Despite the apparent severity of this episode, Plaintiff neither sought nor underwent hospitalization. *See* Ex. 2F/7-9; *see also* Ex. 4F/16 (December 2013: "she has never been admitted before to a mental health unit."). By February 2012 – which Plaintiff claims marks the end of this episode – Plaintiff told her doctors she was "doing much better." (ALJ Op. at 16).

Plaintiff inaccurately claims that the ALJ discounted this episode as the result of noncompliance with her medication regimen. In fact, the ALJ noted that Plaintiff was "paranoid" and "unstable on her medication" in December 2011. *Id.* The ALJ was thorough in her decision and, contrary to Plaintiff's assertions, she considered all of the evidence that Plaintiff highlights. Additionally, a state psychological consultant reviewed Plaintiff's records from this period and found no episodes of decompensation. (Ex. 1A) The ALJ correctly gave that assessment "great weight, as the consultant is familiar with the disability program and its requirements." (ALJ Op. at 18).

### B. Episode Two: October 31, 2012.

Plaintiff's second alleged episode of decompensation, which occurred on October 31, 2012, is based on an assigned Global Assessment of Functioning ("GAF")[4] score of 40, which would indicate a serious limitation. The ALJ correctly

---

[4] "The [Global Assessment Functioning] score is a subjective determination that represents 'the clinician's judgment of the individual's overall level of functioning.'" *Wesley v. Commissioner of Soc. Sec.,* 2000 WL 191664, at *3 (6th Cir.

assigned little weight to GAF scores due to their subjectivity "and a non-standardized measure of symptoms severity that merely captured the claimant's level of functioning or symptoms only at the time of the evaluation." (ALJ Op. at 18); *see also Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 2006 WL 305648, at *13-*14 (6th Cir. 2006) (A GAF score "may have little or no bearing on the subject's social and occupational functioning . . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment Functioning] score in the first place."). Medical notes from the same date indicate that Plaintiff had "no new complaints," was in a "stable mood," was "not depressed and anxious," and her "sleep and appetite were good." (Ex. 2F/24). This is consistent with the ALJ's assessment that Plaintiff's condition "remained unchanged" through November 2012. (ALJ Op. at 16).

    Plaintiff's argument is illogical—she cites the same records to evidence both an episode of decompensation and that episode's resolution. Again, it is clear that Plaintiff's claim has no merit and that the ALJ fully considered all of the evidence in making the RFC determination.

---

Feb. 11, 2000) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994)).

**C. Episode Three: December 12, 2013- January 15, 2014.**

On December 12, 2013, Plaintiff went to the ER complaining of chest pain. Although her test results were normal, she was held for observation. (Ex. 3F/2-5). According to Plaintiff, this qualifies as an episode of decompensation because the physician noted in the records that she seemed to be "very anxious." (Pl.'s Am. Mot. at 12). At a follow-up psychiatric evaluation on December 16, 2013, Plaintiff reported that she was hearing voices and had suicidal thoughts. (Ex. 4F/14). She received inpatient care between December 16 and 20, 2013; at the time of discharge, Plaintiff denied having suicidal ideations or hallucinations of any kind. *Id.*

This four-day hospitalization is not long enough to be considered of "extended duration." *See* R&R at 20 (citing *Accord Donovan v. Comm'r of Soc. Sec.*, No. 12-14671, 2013 WL 6094741, at *11 (E.D. Mich. Nov. 20, 2013) ("Given that the hospitalization period was for only four days, the record strongly suggests that the . . . episode of decompensation . . . was not one of extended duration.")). The ALJ acknowledged this period of hospitalization, and later, noted that Plaintiff had "no psychiatric hospitalizations of *extended duration*." (ALJ Op. at 17).

The Magistrate Judge also pointed out that medical reports suggest that this episode may have been due to noncompliance with medication. *See, e.g.*, Ex 4F/14

(December 2013: "she reported that she was not taking her psychotropic medications . . ."). Likewise, the ALJ considered evidence "that medication compliance and therapy appropriately managed [Plaintiff's] mental symptoms overall." (ALJ Op. at 15). *See Beadle v. Comm'r of SSA*, 2016 WL 7335808, at *9 (N.D. Ohio Nov. 3, 2016) ("An ALJ properly considers a claimant's non-compliance with treatment when assessing the claimant's limitations and credibility.").

The ALJ sufficiently examined all of the evidence in assessing the severity of Plaintiff's impairments. (ALJ Op. at 16-17). Plaintiff cannot point to any evidence that the ALJ erroneously omitted from her decision.

### D. Episode Four: April 15, 2014- June 20, 2014.

Plaintiff claims that the final period of decompensation lasted from April 15, 2014 through June 20, 2014.[5] On April 15, Plaintiff reported that she had been hearing voices at night since moving out of a shelter and into an apartment. She also mentioned that her feelings of depression and stress were lifting. (Ex. 9F/2). The doctor observed that that Plaintiff was "[d]ressed and groomed appropriately," and was speaking clearly. *Id.* She "report[ed] auditory hallucinations" but "[did] not appear to be responding to internal stimuli" at that time. *Id.*

---

[5] The hearing before the ALJ took place on June 20, 2014, although there were no medical records past May 12, 2014.

Plaintiff also felt that the Seroquel (the medication that controlled her hallucinations) was ineffective, and she asked to try a different medication. *Id.* When she returned on May 12, 2014, she reported that her auditory hallucinations had worsened over the last month, and asked to resume Seroquel. *Id.* Although there are no treatment notes between Plaintiff's May 12 appointment and the June 20 hearing, Plaintiff never mentioned at the hearing that she was currently having hallucinations. In fact, as Plaintiff testified, "[i]f I take the medication, I don't hear the voices." (Hr'g Tr. 31). Additionally, Plaintiff "tried to take [her]self off the medication during the daytime and it was not good so [she] had to put [her]self back on and [I'm] not supposed to stop taking it." *Id.* at 30. Plaintiff also said that at that time she had been seeing her doctor once a month, but they were trying to go three months without a visit going forward. *Id.*

That Plaintiff reported increased auditory hallucinations following a change in her environment may suggest that she is prone to decompensation. But the fact that her doctors wanted to decrease the frequency of her treatment undercuts her claims of decompensation, as does the fact that she had been living in an apartment on her own – an unstructured environment – for two and one-half months prior to the hearing. The ALJ considered this. (ALJ Op. at 18). Furthermore, Plaintiff's own hearing testimony is consistent with, and supports, the ALJ's conclusion that Plaintiff's symptoms were well-managed with treatment.

In sum, the Court believes that the Magistrate Judge was correct in finding that the ALJ's RFC assessment was supported by substantial evidence. The ALJ correctly recognized that the doctors in this case concluded that Plaintiff never suffered episodes of decompensation. And again, not only did the psychological consultant find that no episodes of decompensation occurred, there are no references to decompensation or deterioration in the medical records at all. Moreover, the ALJ considered evidence of all of Plaintiff's limitations, and either factored those limitations in the RFC determination, or explained why those limitations were not credible.

## CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that the Report and Recommendation [24] is **ADOPTED** and entered as the findings and conclusions of the Court. Plaintiff's Objection to the Report and Recommendation [25] is **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [23] is **GRANTED**. Plaintiff's Amended Motion for Summary Judgment [19] is **DENIED**.

**SO ORDERED**.

Dated: March 6, 2017

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge